UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


UNITED STATES OF AMERICA,     )
    )
    Plaintiff,     )
    )
    )     Case No. 3:22cr78/MCR
    )
vs.     )     Pensacola, Florida
    )     May 22, 2023
    )     3:00 p.m.
    )
DONALD MARK BELL,     )
    )
    Defendant.     )
_____)


TRANSCRIPT OF **SENTENCING** PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-35)


FOR THE GOVERNMENT:     Jason R. Coody
    Acting United States Attorney
    By: **ALICIA H. FORBES**
        Assistant U.S. Attorney
        *alicia.forbes@usdoj.gov*
    21 East Garden Street, Suite 400
    Pensacola, Florida 32502


FOR THE DEFENDANT:     Joseph F. DeBelder
    Federal Public Defender
    by: **VIRGINIA M. BARE**
        Assistant Public Defender
        *ginnie_bare.org*
    3 West Garden Street, Suite 200
    Pensacola, Florida 32502

P R O C E E D I N G S

*(Court called to order; Defendant present with counsel.)*

**THE COURT:** Good afternoon. Mr. Donald Mark Bell is before the Court for sentencing this afternoon. He is present with Ms. Bare, his attorney. Ms. Forbes and Agent Zeithammel are present for the government. Officer Link is also here in the courtroom from probation.

Mr. Bell's Presentence Investigation Report outlines his guideline calculation. There is one count at issue here. The base offense level and the offense level was computed under 2J1.4. The base offense level is a 6. There were specific offense characteristic adjustments and then a victim-related adjustment of 8 levels combined, acceptance of responsibility of 2 levels.

Total offense level is 12. Criminal History Category is I. The advisory recommended guideline range is 10 to 16 months.

Ms. Bare, from the lectern, I'd ask that you first confirm that you have been over all drafts of the Presentence Investigation Report with Mr. Bell before today, and then I do know that you have a couple of objections. I have reviewed yours and the government's response to the objections, but I'll hear from you.

**MS. BARE:** Yes, Your Honor. Your Honor, I have reviewed all drafts of the Presentence Investigation Report

| | |
|---|---|
| 03:01:51 | 1 |

with Mr. Bell.

**THE COURT:**  Very good.

**MS. BARE:**  After discussion with the government, we are withdrawing the objection to the 6-level increase for the impersonation being committed for the purpose of an unlawful arrest, detention, or search.

**THE COURT:**  Okay.

**MS. BARE:**  We maintain the objection as to the vulnerable victim, and the parties agree that restitution is not at issue.

**THE COURT:**  Okay, very good.  Thank you.

Then, Ms. Forbes, anything you wish me to consider? Do you agree on restitution as well?

**MS. FORBES:**  Yes, Your Honor.  We do ask the Court, you know, under -- to consider Ms. Dalton's impact statement in terms of her -- the effect that the incident had on her.  But she has not submitted a specific restitution request, so at this point we have nothing to propose to the Court, and so we agree that there's no monetary restitution to be awarded.

**THE COURT:**  Okay.  Well, let me hear argument on the victim-related adjustment from you first, Ms. Bare, and then I'll hear from Ms. Forbes.

**MS. BARE:**  Your Honor, the bulk of the argument is already captured in the pleadings, but there -- someone being well into their sixties does not make a person, per se,

| | |
|---|---|
| 03:03:10 | 1 |

vulnerable.  There is no age that makes someone vulnerable.
The Tenth Circuit has specifically stated that being elderly is
not enough standing alone to make a victim vulnerable.

        **THE COURT:**  But that wasn't what we have here.  It
wasn't just her age alone.

        **MS. BARE:**  Yes, Your Honor.  There are two factors
that the government and probation have cited.  They are the
fact that she's in her sixties and the fact that she had
recently lost her husband.  So that's why I was addressing
first the issue of age.

        A person being in their sixties, again, does not make
them vulnerable just because they are, by statutory definition
in Florida, a senior citizen.  Plenty of people are still in
their prime well into their sixties.  And we have no indication
that Ms. Dalton was unable to express her interests at her age
or even with the loss of her husband.

        She was able to reach out to the police, she was
represented, she was engaging in the probate process.  She was
not -- she did not have the combination of factors that the
victim in, say, *Paroline* did.  In that case, the two victims
that were found to be vulnerable were not only in their sixties
and had lost their spouses, but they were financially
unsophisticated.  They were able to be taken advantage of
because the defendant in that case had a close relationship
with the husband, which made it easier for the defendant in

03:04:38  1   that case to take advantage of the victims financially.

03:04:42  2          In this case, there's nothing unusual about Ms. Dalton

03:04:49  3   except for the fact that the family was fighting over how to

03:04:52  4   handle the estate of her deceased husband.

03:04:57  5          And those two factors standing alone are not enough to

03:05:00  6   make her a vulnerable victim.

03:05:00  7          **THE COURT:**  All right.  Thank you.

03:05:03  8          Ms. Forbes?

03:05:04  9          **MS. FORBES:**  Your Honor, as outlined in the

03:05:05  10  government's reply to the defendant's response and this

03:05:05  11  objection, we do think that that is sufficient, that when you

03:05:08  12  look at the totality of the circumstances regarding Ms. Dalton

03:05:11  13  and the situation that both her age at the time as well as the

03:05:16  14  fact that she had lost her husband not only recently but about

03:05:21  15  five weeks prior to the incident, so very, very close in time,

03:05:25  16  and the fact that -- you know, I would say it's actually very

03:05:27  17  similar to the case that Ms. Bare cited, because Mr. Bell had a

03:05:30  18  relationship with those other family members, and I think that

03:05:34  19  just compounded the susceptibility that Ms. Dalton had to being

03:05:39  20  unduly influenced by Mr. Bell's unlawful impersonation of a

03:05:45  21  federal law enforcement officer.

03:05:46  22         **THE COURT:**  I do find the victim to be vulnerable

03:05:49  23  under the terms of the guideline here, not only because of her

03:05:54  24  age -- that standing alone would not have been enough -- but

03:06:00  25  also her recently being widowed is a factor.

But I think on top of that -- and this really wasn't argued explicitly, but on top of that, her husband had passed just a few weeks prior to this incident, and then Mr. Bell showed up on her doorstep with the children of her deceased husband, and they were all there to search for a will that they claimed she was hiding.

And under those circumstances -- age, recently widowed, and then the defendant showing up with the children of her recently deceased husband claiming that she was hiding a will and they were there to search for it is sufficient for me to find the 2-point enhancement applicable.  So the objection will be overruled.

**MS. BARE:**  Your Honor, that is all I have as far as objections.  Do you want me to proceed to argument?

**THE COURT:**  I believe so.

Ms. Forbes, you don't have anything, I presume, from the government's standpoint?

**MS. FORBES:**  No, Your Honor.  No objections to the PSR or additions or corrections.

**THE COURT:**  All right.  Then, yes, Ms. Bare.

Document 36 is your sentencing memorandum.  I've reviewed that with the attachments, but I'll certainly hear from you in argument, yes.

**MS. BARE:**  Your Honor, this entire case is just a sad situation.  Mr. Bell tried to help his friends in a wrong way.

By all accounts, Mr. Dalton was beloved by his family and had been successful, and when he passed away the family did not respond well.  Not that there's a right way to respond to the death of a loved one, but they responded with some strife.

Mr. Bell is very close to a part of this family.  He considers Melissa McAdams' son, Bo, to be his godson, and he wanted to help his friends.  Mr. Bell knows that does not excuse the conduct, but it does provide some context.

At some point in the relationship Mr. Bell had told his friends that he was in law enforcement, and when they reached out to him for support he was stuck in a lie that went absolutely too far.

As far as what specifically happened in the house last March, our office has interviewed the witnesses, and we provided a declaration from Jennifer Zdanowicz.  Their version of events do not match Ms. Dalton's victim impact statement, and it's just something for the Court to consider.

According to Ms. Zdanowicz, Mr. Bell's participation was limited, and he was not shouting or threatening arrest.  Again, it does not undo the conduct, but he was not yelling at anyone or doing some of the things that had been later alleged.

Mr. Bell does not have the kind of criminal record that normally brings someone into this Court.  His only felony is due to a failure to pay child support 22 years ago, and the only time he was ever incarcerated was 44 years ago for a

1  matter of days.

2          He has devoted large periods of his life to service.

3  He spent nearly a decade in the military and was discharged

4  honorably.  Not only is he a disabled veteran himself but he

5  worked at the VA.  There he developed medical skills that he

6  continues to use today.  He still teaches advanced trauma care

7  and the Stop the Bleed class.  He's also devoted to his church.

8          When we think of a sentence that is sufficient but no

9  more than necessary to meet the purposes of the 3553(a)

10  factors, there is not a reason that Mr. Bell needs to be

11  incarcerated.

12          The offense is serious and a felony conviction

13  recognizes that.  He has been deterred from misconduct.  He was

14  trying to help and impress his friends, and instead this has

15  caused sheer embarrassment.  There isn't any safety reason to

16  incarcerate Mr. Bell either.

17          Most importantly in the immediate future for right

18  now, Mr. Bell needs surgery.  As you can tell in the PSR at any

19  time his medical needs are significant, and he has been very

20  worried about the impact that incarceration would have to his

21  care.  He's been worried about continuity of care and the

22  expense of his medication since this process began, but now his

23  needs are pressing.

24          This coming Wednesday -- and I believe it was a

25  surgery appointment -- he has an appointment with the surgery

department for a pre-op to prepare for a surgery that is supposed to be next week on Tuesday, as of now.

Mr. Bell, he needs medical care now. He needs surgery and he needs follow-ups, and he needs the kind of care that cannot immediately be given in the Bureau of Prisons.

Mr. Bell has been on pretrial supervision since November. He has complied and he has been successful. He says that he was reporting weekly up until two months ago.

One of the challenges in Mr. Bell's case is that he lives a pretty middle class life. He has substantial expenses that are not easy to change. He has a mortgage and he has some debt. Looking through the financial portions of the PSR, he has a lot of revolving debt. He's not behind on his bills, but he and his wife do owe nearly $300,000 on his mortgage, and he has six other installment accounts, not counting his credit cards.

As probation already noted, Mr. Bell doesn't really have the money to pay a fine. But his concern is not that directly. It's that, if he's incarcerated, he will lose his benefits. If he's incarcerated over 60 days for a felony, his disability benefits will be -- he'll lose his VA disability benefits under 36 CFR 3.665. And similarly, his SSDI will be suspended if he's incarcerated as well.

The immediate financial impact on him would be that it would be hard to take care of his expenses, which would impact

03:11:50  1  his wife directly.  And he'll tell you about that.  But it

03:11:53  2  would also make it hard for him to meet his responsibilities

03:11:56  3  going forward.

03:11:57  4       For all those reasons, we ask that you not impose a

03:12:01  5  sentence of incarceration.

03:12:02  6       **THE COURT:**  All right.  Thank you, Ms. Bare.

03:12:05  7       **MS. BARE:**  Thank you, Your Honor.

03:12:06  8       **THE COURT:**  Mr. Bell, is there anything you'd like to

03:12:08  9  say to the Court?  If so, you're fine where you are.  And

03:12:10  10  actually, I appreciate you standing, but it will be better if

03:12:13  11  you remain seated because the microphone is that low-profile

03:12:16  12  device there in front of you, and I'll be able to hear you

03:12:20  13  better.  Thank you.

03:12:22  14       **THE DEFENDANT:**  Yes, ma'am.  Your Honor, I'm ashamed

03:12:24  15  to be here today in front of you.  It's been over a year since

03:12:27  16  this happened, and I've had a lot of time to think it through

03:12:29  17  and understand the stupidity of my actions and everything else.

03:12:32  18       I have tremendous respect for law enforcement.  I have

03:12:35  19  all my life.  I spent almost a decade in the military.  I was

03:12:39  20  raised as a military son.

03:12:41  21       I've really, really gone over everything that I done,

03:12:45  22  and I see how that I stole valor of a law enforcement agency.

03:12:49  23  And I wouldn't have been very happy and I'm not very happy when

03:12:52  24  I see people do that to the military.  So looking back on it, I

03:12:56  25  was extremely stupid, and I'm very sorry for having done it.

03:12:59  1          Looking at how much work I caused the marshals and the
03:13:01  2   other agencies, I'm totally embarrassed with myself and upset
03:13:04  3   with myself for what they had to go through to get me into this
03:13:08  4   room with you today.  I probably should have expected it, but I
03:13:12  5   never expected so many resources to go into investigating this
03:13:16  6   whole event and everything that was going on behind it.  I very
03:13:19  7   much regret the time and money law enforcement has had to put
03:13:21  8   into it, and all the time is probably pretty significant from
03:13:24  9   what I can see.
03:13:27  10          I very sincerely apologize for having caused the
03:13:30  11   stress and work they had to go through.  I recognize very much
03:13:34  12   the danger people produce by pretending they're in law
03:13:41  13   enforcement.  The more I think on it, the more stupid I was.
03:13:44  14          I'm sorry physically -- mentally and physically it's
03:13:48  15   tearing me up, and emotionally.  I've thought a lot about that
03:13:53  16   day and how I went off track and really will never do anything
03:13:57  17   like that again.
03:13:58  18          Your Honor, Melissa, the mother of my godson, was
03:14:02  19   having a rough time.  She had lost her stepfather, lost all of
03:14:06  20   her possessions -- or thought she was losing all of her
03:14:12  21   possessions.  So she asked me to come help them to make sure
03:14:17  22   everything went smoothly.
03:14:18  23          On the way up, I told them we needed to stop by the
03:14:22  24   sheriff's office, so we stopped by the sheriff's office.  I
03:14:26  25   want the Court to know that, while I'm not proud of how I

| | |
|---|---|
| 03:14:28 | 1 |
| 03:14:33 | 2 |
| 03:14:35 | 3 |
| 03:14:39 | 4 |
| 03:14:42 | 5 |
| 03:14:46 | 6 |
| 03:14:51 | 7 |
| 03:14:55 | 8 |
| 03:14:59 | 9 |
| 03:15:01 | 10 |
| 03:15:03 | 11 |
| 03:15:08 | 12 |
| 03:15:11 | 13 |
| 03:15:11 | 14 |
| 03:15:14 | 15 |
| 03:15:18 | 16 |
| 03:15:21 | 17 |
| 03:15:26 | 18 |
| 03:15:30 | 19 |
| 03:15:33 | 20 |
| 03:15:37 | 21 |
| 03:15:41 | 22 |
| 03:15:45 | 23 |
| 03:15:50 | 24 |
| 03:15:54 | 25 |

acted, I never shouted at anybody or threatened anyone in the less than five minutes I was in contact with Ms. Dalton.

I identified myself as Don Bell, I told her I was a friend of the family. And when she told me that it was time -- that I wasn't family, I had to leave, at that time Daniel, Melissa's half-brother, came into the living room from a side room and was complaining that stuff was missing and his voice was starting to raise and so forth, and I tapped him on the shoulder and said "Let's go outside."

So within five minutes -- less than five minutes, he and I went outside, we stayed outside for the duration.

Ms. Dalton had two horses on the south end down by the entryway. I went down and talked to them, and as I went to talk to them, they came to me, so I petted them for a little while, and then I hung out by my car.

Over the last 14 months, I've come to realize more and more how wrong I was then and what I did was totally wrong.

It hasn't been an easy time for me. Physically some of the chronic illnesses and injuries that I've had in my military career and since have worsened significantly, threatening the use of my left arm and both of my legs.

Wednesday I meet with the surgeon to finalize the somewhat emergent -- urgent anyway -- surgery on my C-spine where they're going to fix two, possibly three -- they need to do three but one treatment will fix two, and they can only do

| | | |
|---|---|---|
| 03:15:59 | 1 | two treatments -- that type of treatment on two locations |
| 03:16:01 | 2 | concurrently, and then the third one will probably be a |
| 03:16:04 | 3 | different type of procedure. |
| 03:16:05 | 4 | Upon recovery from that, I'm going to have to go in |
| 03:16:09 | 5 | and have -- *(defendant crying)* -- lumbar surgery because I'm |
| 03:16:17 | 6 | getting compression in my spine that's causing me to have fecal |
| 03:16:21 | 7 | incidents and will probably lose my lower intestines and my |
| 03:16:26 | 8 | legs if I don't get surgery there. But the neck is more |
| 03:16:26 | 9 | important. |
| 03:16:29 | 10 | It's been a very rough time physically, medically, and |
| 03:16:33 | 11 | emotionally, and my concern on sentencing is incarceration. |
| 03:16:37 | 12 | Should I get more than 59 days in prison, I have to pay back 59 |
| 03:16:43 | 13 | days of pay or two months of pay and then lose my pay until I'm |
| 03:16:48 | 14 | out. And I understand it takes five to seven years to get the |
| 03:16:52 | 15 | pay from that point forward back, so I would be out of income |
| 03:16:56 | 16 | for a significant amount of time. |
| 03:16:58 | 17 | My wife and I -- the person that I hurt the most in |
| 03:17:02 | 18 | this, aside from myself, is my wife. She's very upset with me |
| 03:17:06 | 19 | and not too happy. She's been supportive but she's been very |
| 03:17:10 | 20 | frustrated and disappointed with me. We just bought a house |
| 03:17:15 | 21 | two years ago, and we still have 28 years to go on the |
| 03:17:19 | 22 | payments, and she expects me to cover half of that, and which I |
| 03:17:22 | 23 | do, too, I expect me to cover half of that. |
| 03:17:23 | 24 | I'm worried about my wife if I get incarcerated and my |
| 03:17:25 | 25 | diabetic service dog. I have a dog that helps me with my |

03:17:28  1   diabetic services -- or with my diabetic issues, and I consider

03:17:33  2   him part of my family, as does my wife.  If I'm away from my

03:17:37  3   dog for more than a day, my wife can't keep him calm and keep

03:17:42  4   him happy because he gets upset that he's not there checking on

03:17:45  5   me.

03:17:45  6         I've never imagined myself in a federal courthouse at

03:17:48  7   this level, and pissed that I allowed it to happen.  I've been

03:17:57  8   in service to the Army, the church, and the VA all my adult

03:17:58  9   life until retired medically.

03:18:00  10        I understand the need to be accountable, and I accept

03:18:03  11   the ability *[sic]* that I have to be accountable.  This felony

03:18:06  12   has already changed my life, and I want to be able to keep

03:18:09  13   providing for my family.  And that's it.

03:18:12  14        **THE COURT:**  All right.  Thank you, Mr. Bell.

03:18:13  15        Ms. Forbes, I'll hear from the government.

03:18:16  16        **MS. FORBES:**  Your Honor, Donald Bell didn't just lie

03:18:28  17   about being a federal law enforcement officer on March 28th,

03:18:31  18   2022, and he didn't do so just to help out one grieving family.

03:18:37  19   By all accounts, when you look at Mr. Bell's history and

03:18:40  20   circumstances, if you've talk to anyone who Mr. Bell has ever

03:18:44  21   talked to, he's probably been doing this for a very significant

03:18:47  22   amount of time.

03:18:48  23        He's probably been lying his whole life to suit his

03:18:52  24   own selfish wants and purposes, to make himself feel better.  I

03:18:57  25   mean, no one really knows all the purposes.  But every person

that has been interviewed in this case has said that Mr. Bell told them he's a federal marshal. Some of them have even gone on to say he's a medical doctor or he's a reverend.

And he even went as far to say that he was not only a federal marshal but he was a task force officer with the Department of Homeland Security when he went to the Okaloosa substation in Crestview on that day. And all of those people that he accompanied to this house he had lied to years before about his fake law enforcement history.

So, while the crime for which Mr. Bell is being sentenced for is for having impersonated a federal law enforcement officer on that day, March 28th, 2022, the Court obviously must consider the entire history of Mr. Bell, his characteristics, as well as, you know, the specific offense characteristics to include his relevant conduct.

As the PSR noted, even in 2021 he had lied about being a federal marshal ostensibly to try to get out of a speeding ticket. It sort of worked. He got a lesser offense.

When ATF went out to interview Mr. Bell regarding this incident, when they encountered a neighbor of his, they were like, *Oh, yeah, Marshal Bell, we know him. He's retired federal law enforcement. He's basically our de facto neighborhood watch, and we feel super safe having him here.*

So this was not just sort of a lie of convenience for Mr. Bell because he felt bad for this one family. It's

something he's been perpetuating for a very long time, and it just came to a head here, unfortunately, in Okaloosa County.

And what's particularly aggravating about the specific conduct underlying this charge is that, as the Court knows from your many years on this bench, that domestic situations often carry the highest risk of danger to law enforcement responding to them as well as to, obviously, the people involved because of those heightened emotions and the close ties between them. And there's always a risk of domestic situations like the one that Okaloosa County Sheriff's Office encountered on March 28th coming to a head and, you know, turning into a violent and dangerous situation for all people involved.

And Mr. Bell put himself right in the middle of that and stirred up this family drama that was already grieving and a highly contested issue within the family, and he inserted himself right there for the specific purpose of helping them get into a house that they didn't have a legal right to go into to conduct an unlawful search, an unlawful inventory that they had no court order to be allowed to do, and a mere approximately five weeks after Ms. Dalton's husband died.

And so the guidelines take that into account. You know, justly so, there's a high enhancement under the guidelines when the impersonation is for the purpose of conducting an unlawful search or arrest or detention. And the rationale behind that is obvious, because those are very real

situations that can create a danger for law enforcement, just as any unlawful search or unlawful arrest under any situation can cause.

He stated -- as borne out in the Statement of Facts that Mr. Bell swore under oath was true and as was recorded by body camera of the Okaloosa corporal who was at the Crestview substation, he explicitly told them his entire purpose for going there was to get in the house and remove things -- so to conduct a search; it was to bust her if needed, basically like he admitted to Okaloosa corporal that, you know, *If she needs to be arrested, I'm going to take her in*. And then he said, *If nothing else, I'm going to scare her into releasing the will.*

So he told law enforcement that that was his stated purpose for being there. So it seems a little disingenuous to say after the fact that, oh, well, you know, he was otherwise very -- had already limited involvement once they actually got into the house, when Ms. Dalton has very consistently said, *It's the only reason I let them in. I didn't want to let them in, but this marshal came to the door*. And so she felt like she had to let them in and, but for his presence, she wouldn't have.

So his particular use of this fake marshal persona that he's held for so long on March 28th here in the Northern District of Florida, you know, based on the nature and circumstances, certainly that's an aggravating factor in terms

of how he used it, and certainly makes the defendant's crime different than others who are convicted under this same statute who simply lie to impress people or lie about it to get out of a speeding ticket, although history has shown that Mr. Bell has done it for those purposes as well.

Ms. Bare, in her sentencing memorandum and in her argument today to the Court, asks Your Honor to tailor -- I think the words she used was tailor the consequences of his actions to the circumstances of the crime that he committed on March 28th.

Of course, in one respect, Ms. Bare is correct, because under 3553(a) that is one of the factors that the Court is supposed to look at, give just punishment for the crime that was committed. But, of course, as the Court knows, the mere circumstances of that one afternoon can't be considered in a vacuum. The Court has to consider all of the relevant conduct related to that as well as all of Mr. Bell's history and as well I think particularly important in this case is the need for deterrence.

I found Mr. Bell's statement to the Court interesting because he explicitly expressed that he had regrets about the time and cost spent by law enforcement investigating this case. But I didn't hear him expressing regret for actually having lied to them or actually having pretended to be one of them and expressing the harm that that caused. And he didn't seem to

express regret for even lying to the very people who he says were his close family -- his close friends, the mother of his godson, he lied to her, too, about being a federal marshal.

So I think the Court has to consider that this was not just some one-off incident for Mr. Bell because of his, you know, particular relationship with this family. It just turned out to be the most brazen and caused the most amount of trouble compared to all the other instances where he has perpetuated this lie.

So, if Mr. Bell was willing to tell everybody he met here -- you know, travel all the way up here from the Tampa area, tell multiple law enforcement officers and tell all these civilians that he was a law enforcement officer and that he was going to go in and scare this poor widow into -- you know, going into her house without her permission and removing things and searching for this will and searching for these guns, you know, what else would Mr. Bell be willing to do in the future.

So, in terms of specific deterrence, that's obviously a real concern. But also, as always, general deterrence is out there for people that's -- unfortunately, Mr. Bell isn't operating in a vacuum, he's not a special person, he's not the first one to come up with this idea of pretending to be law enforcement, but that is a real concern.

And I understand that there are always going to be collateral consequences, very unfortunate collateral

consequences as a result of not only Mr. Bell's actions but crimes similar to these, but unfortunately those are not sentencing factors under 3553(a).  But what is is promoting respect for the law.

And I think that's another important factor for the Court to consider because this sentence needs to reflect that. Because Mr. Bell not only disrespected this Court by committing this crime, he disrespected the real federal marshals that work in this courthouse every day and the real federal law enforcement officers who, now because of his crime and because of others who commit crimes like him, have to fight a little harder against a growing mistrust of law enforcement in this community who now, because of these types of crimes, now they're not even sure they can believe when they see a badge or they see credentials because people like the defendant fooled them with those very same things.

And he disrespected all of those Okaloosa County local sheriff's deputies and investigators that he lied to and put in a totally unnecessary dangerous situation by stirring up this disturbance at the Dalton home on March 28th.

And he even disrespected the state probate court system by flagrantly disregarding the very proper processes that happen as a result when someone passes away and leaves behind heirs and property.  You know, there is a lawful regulated system for dealing with that, and he just totally

| | |
|---|---|
| 03:29:00 | 1 |
| 03:29:02 | 2 |
| 03:29:07 | 3 |
| 03:29:10 | 4 |
| 03:29:12 | 5 |
| 03:29:16 | 6 |
| 03:29:19 | 7 |
| 03:29:19 | 8 |
| 03:29:21 | 9 |
| 03:29:30 | 10 |
| 03:29:34 | 11 |
| 03:29:36 | 12 |
| 03:29:44 | 13 |
| 03:29:49 | 14 |
| 03:30:00 | 15 |
| 03:30:05 | 16 |
| 03:30:08 | 17 |
| 03:30:12 | 18 |
| 03:30:23 | 19 |
| 03:30:26 | 20 |
| 03:30:30 | 21 |
| 03:30:32 | 22 |
| 03:30:41 | 23 |
| 03:30:43 | 24 |
| 03:30:51 | 25 |

flaunted that and assisted these people in doing so, you know, and misleading them essentially into thinking he could help them get this done without the proper paperwork and without going through the right channels.

So I think, when the Court looks at all of the 3553(a) factors, a guideline sentence is absolutely appropriate in this case.

**THE COURT:** All right. Thank you.

As indicated earlier, the guideline range here is 10 to 16 months, and my sentence is going to be a 10-month sentence, Mr. Bell.

This conduct is deeply concerning. Our law enforcement officers are vetted, they're trained, and because of that, they wield considerable authority in our society. And they wield that authority pursuant to standards, pursuant to procedures, pursuant to laws that govern their conduct. And they're held accountable for that, and society understands that. And that's hopefully what instills trust in our society for law enforcement, that the law enforcement officers are subject to standards, are subject to procedures and laws, and that they're held accountable for that.

People who commit the crime like you did, impersonating a law enforcement officer, and particularly in such a repeated way and a brazen way, completely erodes that trust in our law enforcement. You are not vetted. You are not

| | |
|---|---|
| 03:30:56 | 1 |
| 03:31:02 | 2 |
| 03:31:09 | 3 |
| 03:31:14 | 4 |
| 03:31:19 | 5 |
| 03:31:24 | 6 |
| 03:31:32 | 7 |
| 03:31:40 | 8 |
| 03:31:44 | 9 |
| 03:31:47 | 10 |
| 03:31:53 | 11 |
| 03:31:58 | 12 |
| 03:32:02 | 13 |
| 03:32:12 | 14 |
| 03:32:16 | 15 |
| 03:32:19 | 16 |
| 03:32:24 | 17 |
| 03:32:27 | 18 |
| 03:32:30 | 19 |
| 03:32:34 | 20 |
| 03:32:42 | 21 |
| 03:32:47 | 22 |
| 03:32:51 | 23 |
| 03:32:55 | 24 |
| 03:32:58 | 25 |

trained.  You do not hold any level of authority whatsoever in law enforcement.  But because people in this society, mostly -- not everyone, but mostly -- we can expect that people will yield to law enforcement because law enforcement has that trust and has that authority pursuant to those laws and standards. And we've come to expect that in our society.  But again, you didn't have any of that.  And it's dangerous.  It's nothing short of dangerous.

And on this particular occasion -- and there were others, which is what I referenced when I said repeated and brazen -- and I still haven't heard any explanation for it.  I don't know why you put yourself out there as you have to people in society as a United States Marshal or a Homeland Security agent.  I still haven't heard any explanation for that.  I mean, whether you suffer from a mental illness that causes you to somehow actually believe that, I don't know.  Like I said, no explanation has been provided to me.

But what is before me is the fact that you've done that on multiple occasions, and on this occasion you did it to the detriment of someone who was -- we've been over this -- found to be a vulnerable victim, but she was in the sanctity of her home.  I mean, we have an amendment in our Constitution that protects that, that if you had been a law enforcement officer and you had violated her Fourth Amendment rights, you would have been held accountable.  But that's not available to

03:33:04   1   her because you were not a law enforcement officer.  And so

03:33:14   2   it's particularly egregious what happened on this occasion.

03:33:19   3         And I have read her Victim Impact Statement.  And I

03:33:22   4   don't need to decide whether you were shouting or yelling or

03:33:26   5   not.  Just the gravity of the situation, as Ms. Forbes pointed

03:33:32   6   out in her argument to the Court, was dangerous in and of

03:33:39   7   itself.  You had no idea what could erupt in that very hostile

03:33:46   8   environment.

03:33:47   9         And I heard Ms. Bare -- and I respect Ms. Bare, she's

03:33:53   10   a good lawyer, and I know she's got a job to do.  But she

03:33:58   11   argued to me that you've been deterred.  But I would note that

03:34:01   12   you are still driving around in a big black SUV with a K-9

03:34:08   13   insignia on the back of your vehicle.

03:34:11   14         **THE DEFENDANT:**  May I speak to that, Your Honor?

03:34:12   15         **THE COURT:**  No, not right now.  I may hear from you in

03:34:15   16   a moment.

03:34:16   17         But that's a concern.  You may say, *Oh, I have a*

03:34:20   18   *service dog.*  Well, a lot of people have service dogs that do

03:34:23   19   not have K-9 insignia on their vehicle.  I have four dogs, and

03:34:27   20   I don't have K-9 insignia.  Some people have placards or signs

03:34:31   21   that are hung that say "Service Dog."  But that insignia is

03:34:34   22   significant, and you know why and I know why, because it

03:34:38   23   suggests law enforcement.

03:34:40   24         I also understand you had your vehicle equipped --

03:34:45   25   when you went into this woman's home, you have lights that were

03:34:49 1 embedded in the grill or the front part of your vehicle and

03:34:56  2 maybe even sirens, I can't remember, but again, fully

03:35:01  3 suggestive of law enforcement. That is dangerous. I mean, I

03:35:04  4 just can't be any more clear.

03:35:07  5      And if it -- I have taken into account the mitigating

03:35:11  6 factors that Ms. Bare has raised with me, and I do consider

03:35:15  7 them, and that's why I'm imposing a sentence at the low end of

03:35:19  8 the range. Because if it wasn't for a health conditions, if it

03:35:23  9 wasn't for your military service, I would be imposing a

03:35:27 10 sentence at the highest end of the range because I find this so

03:35:32 11 offensive -- this conduct -- to our society that I think it

03:35:37 12 would warrant that type of a sentence, particularly the way you

03:35:40 13 used it on this day in question that we're here about.

03:35:44 14      And so now I'll hear from you if you want to explain

03:35:47 15 your K-9 insignia.

03:35:49 16     **THE DEFENDANT:** For many years I ran a K-9 search and

03:35:54 17 rescue. K-9 stickers are on almost every K-9 search and rescue

03:36:00 18 unit out there. I have a dog that's a Belgian Malinois that's

03:36:04 19 very aggressive to people coming to my car. I wanted the

03:36:05 20 people to know when they come by the car that there's probably

03:36:06 21 a dog in there. And I have a service dog. I know many people

03:36:10 22 with service dogs, especially big ones, although mine is a

03:36:14 23 Maltese who tells me when my sugar is high or too low, that

03:36:19 24 also doesn't particularly like people around me or my wife. So

03:36:22 25 I put the K-9 sticker on the back of the car to let people

| | |
|---|---|
| 03:36:26 | 1 |
| 03:36:29 | 2 |
| 03:36:31 | 3 |
| 03:36:37 | 4 |
| 03:36:40 | 5 |
| 03:36:41 | 6 |
| 03:36:42 | 7 |
| 03:36:43 | 8 |
| 03:36:46 | 9 |
| 03:36:47 | 10 |
| 03:36:48 | 11 |
| 03:36:53 | 12 |
| 03:36:58 | 13 |
| 03:36:59 | 14 |
| 03:37:04 | 15 |
| 03:37:06 | 16 |
| 03:37:09 | 17 |
| 03:37:14 | 18 |
| 03:37:18 | 19 |
| 03:37:27 | 20 |
| 03:37:30 | 21 |
| 03:37:34 | 22 |
| 03:37:38 | 23 |
| 03:37:44 | 24 |
| 03:37:51 | 25 |

coming to car know that there's probably a dog in there, to stay back, keep away from the dog.  I have that same car still because it's a $90,000 car that I still owe $42,000 on, or 38, somewhere in there, and I'm not going to sell it and get rid of it and go from there.

**THE COURT:**  Do you still have the lights --

**THE DEFENDANT:**  No, ma'am.

**THE COURT:**  Okay.  Any type of horn or siren or anything like that?

**THE DEFENDANT:**  No, ma'am.

**THE COURT:**  Okay.  Well, thank you for that explanation.  It's still concerning in light of what we know has happened here.

**THE DEFENDANT:**  Yes, ma'am.

**THE COURT:**  The sentence I'm going to impose, as I said, is a 10-month sentence.  I'm going to recommend that you serve this sentence at a federal medical center.  I'm also not going to give you a surrender date.  I'm going to allow you to address your pressing medical needs as far as your lumbar problems and cervical spine problems.

But I need an accounting or something from the medical doctors, Ms. Bare, as to what Mr. Bell is looking at and what is the estimate or projected amount of time for surgery and recovery.  I'll be reasonable with this, but it won't be in perpetuity, obviously.

03:37:53  1      **MS. BARE:**  Your Honor, just to clarify, I think we can

03:37:56  2   easily get a timeline for -- or relatively easily get a

03:37:59  3   timeline for the cervical surgery, but the lumbar surgery is

03:38:02  4   supposed to be after that has fully healed.  So I want to

03:38:07  5   clarify that, I mean, that could be six months.

03:38:09  6      **THE COURT:**  Well, I would like something from the

03:38:11  7   physician -- I don't know if a neurosurgeon, I don't know who

03:38:14  8   he's seeing, but I need something that outlines what he's

03:38:17  9   looking at medically.  And I'll hear from Ms. Forbes.  We may

03:38:22  10  need to have another hearing to see whether he has to report

03:38:28  11  after the cervical or whether it can all be done in a six-month

03:38:35  12  time period and then I can have him report after that.

03:38:37  13      I certainly prefer that he have it taken care of

03:38:40  14  outside the BOP, as long as that's reasonable.  And I just

03:38:47  15  don't know.

03:38:48  16      I don't know what you're looking at, Mr. Bell, so I

03:38:52  17  would need that from your medical providers.

03:38:54  18      **THE DEFENDANT:**  I could give you a rough of the

03:38:56  19  cervical spine.  I'll spend two to three weeks in the hospital,

03:39:00  20  depending upon complications, probably two days, maybe three or

03:39:05  21  four days.  Recovery on that is typically six months.  And then

03:39:08  22  shortly thereafter they're talking about doing the lower lumbar

03:39:11  23  section.  Recovery on that, unfortunately, is a lot longer

03:39:15  24  because I have 52 percent occlusion of the spine intermittently

03:39:20  25  throughout my day or whatever, and the recovery from that can

be anywhere from a month to eight months.

          **THE COURT:**  Well, I need to hear from --

          **THE DEFENDANT:**  But I would be comfortable going to surgery, spending my time in the hospital, and then getting the incarceration out of the way.

          **THE COURT:**  So give me a timeline, please, in terms of what he's looking at.  I know a little bit about back surgery, having had two myself.  So if you'll provide that to me, what his diagnosis is specifically and what the recommended plan of treatment is and when.

          And then, Ms. Forbes, I'll certainly hear from the government in that regard.

          **MS. FORBES:**  Yes, Your Honor.

          **THE COURT:**  Do you have something to add?

          **MS. FORBES:**  No, just that I know that probation has gotten at least some of his current medical records from the VA directly, and so that also might be a way that we could get that information is to get some further recent information from his treating provider at the VA.

          **THE COURT:**  I assume this is being done through the VA?

          **THE DEFENDANT:**  At the VA, yes, ma'am.

          **THE COURT:**  Okay.  Well, let's see if we can -- I don't know that in the medical records you've received, Officer Link -- because I don't think I knew until the sentencing memo

03:40:38  1   that he had surgery scheduled.

03:40:40  2           Did you know that?

03:40:41  3           **U.S.P.O. LINK:**  I did not, Your Honor.  I think that

03:40:42  4   was a recent update.

03:40:45  5           **THE DEFENDANT:**  It just happened over the last three

03:40:47  6   weeks.

03:40:47  7           **THE COURT:**  Okay.  Let me get a current status.

03:40:52  8           **THE DEFENDANT:**  We'll know more after Wednesday,

03:40:54  9   ma'am.

03:40:54  10          **THE COURT:**  Let me just get a current status.  So I'm

03:40:57  11  not going to give you a surrender date today, Mr. Bell.  I need

03:41:01  12  to formally, obviously, pronounce your sentence.  I will allow

03:41:04  13  you to remain on supervision, as you have been since your

03:41:11  14  indictment and arrest, as long as you remain compliant.  And so

03:41:20  15  please continue to be compliant because otherwise I'll have to

03:41:23  16  take you into custody.

03:41:24  17          **THE DEFENDANT:**  Yes, ma'am, I understand.  I'm not

03:41:26  18  doing anything wrong.

03:41:27  19          **THE COURT:**  All right, very good.  And I understand

03:41:28  20  you haven't been, so that's very good.

03:41:30  21          And Mr. Bell is being supervised in the Middle

03:41:33  22  District of Florida?

03:41:35  23          **U.S.P.O. LINK:**  That's correct, Your Honor.

03:41:36  24          **THE COURT:**  All right.  Mr. Bell, I do need to

03:41:39  25  formally pronounce sentence, so if you would rise at this time,

please.

*[Defendant complies.]*

Mr. Bell, at this time, the Court does formally adjudicate you guilty of Count One of the Indictment, and that's consistent with your plea of guilty to the charge.

I do find your Presentence Investigation Report to be accurate. I order the findings of the report incorporated into the following sentence:

Pursuant to the Sentencing Reform Act of 1984 and all amendments to that law, it is the judgment of this Court that the defendant, Donald Mark Bell, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 10 months as to Count One of the Indictment.

I have considered all of the factors in 18 U.S.C. 3553(a), and I don't need to repeat those factors here now. I think I've stated the basis for my decision. And if I didn't stress general deterrence, I'll do so now. And that should be reflected in the Statement of Reasons that that is an important consideration as well as promoting respect for the law in terms of this sentence.

Restitution is not ordered. There will also not be a fine imposed. However, Mr. Bell, pursuant to law, there is a special monetary assessment of $100 for the one felony count of conviction, and that is due and payable immediately.

You may be seated.

03:42:58　1　　　　　　　　　*[Defendant seated.]*

03:42:59　2　　　　　　When you're released from custody, you'll be on a

03:43:02　3　period of supervised release under the jurisdiction of this

03:43:05　4　Court for a term of one year as to Count One.  Supervision will

03:43:08　5　be under the mandatory and standard conditions that are adopted

03:43:11　6　for use in this district, including DNA testing, together with

03:43:15　7　the following special conditions:  They are outlined in

03:43:19　8　paragraphs 87 through 89 of your Presentence Report.

03:43:24　9　　　　　　There will be a mental health evaluation and, if

03:43:26　10　necessary, you'll participate in treatment as determined

03:43:30　11　necessary through that evaluation process.  You will be subject

03:43:32　12　to our standard search condition during the term of your

03:43:36　13　supervision as well.

03:43:38　14　　　　　　You are prohibited from possessing any law enforcement

03:43:42　15　insignia or materials that may be used to impersonate a law

03:43:48　16　enforcement officer without first procuring the consent of your

03:43:52　17　probation officer.  And I would be very surprised if that

03:43:55　18　consent would be given.

03:43:56　19　　　　　　Under the circumstances that you've explained to me

03:44:00　20　regarding your service dog, I will not require that you remove

03:44:03　21　the K-9 insignia, but that is the only law enforcement related

03:44:13　22　material or insignia that I will permit you to possess during

03:44:16　23　the term of your supervision.

03:44:18　24　　　　　　**THE DEFENDANT:**  Yes, ma'am.

03:44:19　25　　　　　　May I address the mental health issue, ma'am?

03:44:21  1    **THE COURT:**  Yes.

03:44:22  2    **THE DEFENDANT:**  When I came in for pretrial, I had a

03:44:24  3    young lady come in and talk to me and ask if I had any PTSD or

03:44:29  4    any other issue.  I informed her no, but I did have a doctor in

03:44:34  5    the Veterans Administration.  Because of my military history,

03:44:36  6    you'd think I needed one, so I did an eight-hour mental health

03:44:39  7    exam, which, by the way, is painful and long and aggravating.

03:44:43  8    It's in my medical records.  You should have a copy of it

03:44:45  9    there.  And it came back clean, in that, I have no PTSD or any

03:44:49  10   other mental issues.

03:44:50  11   **THE COURT:**  Well, if that's the case, then that will

03:44:53  12   be reflected at that time.  The probation office will review

03:45:00  13   that, and it may be that -- my condition is only if it's

03:45:04  14   necessary.  And so I'm sure they -- I don't know that there

03:45:07  15   will be a need to repeat that if you've already had that done.

03:45:10  16   But I'm going to leave that to probation.

03:45:12  17   **THE DEFENDANT:**  It should be in the records they

03:45:14  18   already acquired.

03:45:15  19   **THE COURT:**  I saw something about that in the PSR, so

03:45:17  20   I'm sure it's there.  They'll review it.  And if they're

03:45:21  21   satisfied with that, then I am satisfied with it.

03:45:23  22   **THE DEFENDANT:**  Yes, ma'am.

03:45:26  23   **THE COURT:**  There is no forfeiture at issue here.

03:45:28  24   The total sentence, Mr. Bell, is 10 months'

03:45:31  25   incarceration, one year of supervision, and a $100 special

03:45:34   1    monetary assessment.

03:45:34   2            Do you understand the sentence?

03:45:37   3            **THE DEFENDANT:**  I do.

03:45:38   4            **THE COURT:**  Ms. Bare, I would ask you and Ms. Forbes

03:45:46   5    to get together with probation to get me the information that I

03:45:49   6    need about a surrender date.  And if we need to come back

03:45:53   7    together in the courtroom, that's fine, just let me know that.

03:45:56   8    If we need to do a telephone call, that's fine, too.  But I

03:45:59   9    will need to impose a date at some point.  It doesn't have to

03:46:02   10   be today or tomorrow, but it's going to need to be at least

03:46:06   11   set.

03:46:06   12           And when that date is set, Mr. Bell, there will be an

03:46:10   13   order entered to that effect that will tell you the surrender

03:46:14   14   date.

03:46:15   15           **THE DEFENDANT:**  Where do I go for that, up here or

03:46:19   16   down there?

03:46:20   17           **THE COURT:**  Go for what, sir?

03:46:22   18           **THE DEFENDANT:**  For surrender.

03:46:24   19           **THE COURT:**  That's a good question, and I apologize I

03:46:26   20   didn't address it.  Depending on where your designated

03:46:28   21   institution is located, you are going to be free to report to

03:46:32   22   that institution yourself, but that would be at your own

03:46:36   23   expense.  And I can't tell you today or at any point -- I don't

03:46:39   24   make that decision.

03:46:42   25           I've recommended a federal medical center for service

03:46:46  1   of this sentence.  The closest one to this district is in

03:46:49  2   Butner, North Carolina.  The closest one to the Middle District

03:46:53  3   of Florida is actually in Miami in the Southern District of

03:46:56  4   Florida.  The Bureau of Prisons doesn't have to follow my

03:47:02  5   recommendation.

03:47:03  6            **THE DEFENDANT:**  I understand that.

03:47:04  7            **THE COURT:**  So please remember that.

03:47:06  8            **THE DEFENDANT:**  I understand.

03:47:06  9            **THE COURT:**  I will indicate -- I should have done

03:47:09  10  this.  If the federal medical center designation is not

03:47:14  11  something the BOP feels is required after reviewing all of your

03:47:19  12  records, then I would recommend a camp for service of this

03:47:24  13  sentence.  I don't see that you need a higher security

03:47:28  14  classification above a camp, but again, that's my

03:47:34  15  recommendation.

03:47:35  16            I believe the closest to you in the Middle District --

03:47:40  17  I believe Coleman has a men's camp.  I know they have a women's

03:47:47  18  camp, I believe they have a men's.  And then, outside of that,

03:47:51  19  it would be the Pensacola, the federal prison camp here.

03:47:51  20            **THE DEFENDANT:**  Yes, ma'am.

03:47:55  21            **THE COURT:**  So we can list all of those.  The Bureau

03:47:58  22  of Prisons, again, will ultimately make that decision, though.

03:47:58  23            **THE DEFENDANT:**  Yes, ma'am.

03:48:00  24            **THE COURT:**  Now, in terms of you surrendering, as I

03:48:03  25  said, you can surrender to -- the date and time I will give you

| 03:48:06 | 1 | in my order, you can surrender to the institution at your own |
| 03:48:09 | 2 | expense. If you can't afford the cost of the travel to the |
| 03:48:12 | 3 | institution, then you would have to report to the Marshals |
| 03:48:15 | 4 | Service, which I would permit you to do that in the Middle |
| 03:48:18 | 5 | District. They would take you into custody, and you very |
| 03:48:20 | 6 | likely would spend some time in county jail at that point, so |
| 03:48:25 | 7 | it's better if you can afford the cost of your own travel. |
| 03:48:28 | 8 | **THE DEFENDANT:** Yes, ma'am. |
| 03:48:29 | 9 | **THE COURT:** Any other questions or anything else from |
| 03:48:31 | 10 | the government? |
| 03:48:31 | 11 | **MS. FORBES:** No, Your Honor. |
| 03:48:33 | 12 | **THE COURT:** Mr. Bell, you do have the right to appeal |
| 03:48:35 | 13 | from this decision. Should you choose to do so, your notice of |
| 03:48:38 | 14 | appeal must be filed within 14 days of the date of the Court's |
| 03:48:42 | 15 | written judgment. That's not today's date. Your sentence will |
| 03:48:46 | 16 | be reduced to writing, it will be filed as a written judgment |
| 03:48:49 | 17 | in our court electronic docket sometime in the next few days. |
| 03:48:53 | 18 | That's when your time to appeal begins to run, those 14 days. |
| 03:48:58 | 19 | **THE DEFENDANT:** Yes, ma'am. |
| 03:48:58 | 20 | **THE COURT:** If you can't afford the cost of an appeal, |
| 03:49:00 | 21 | you may file for leave to appeal at no cost to you. |
| 03:49:02 | 22 | Ms. Bare will speak to you further about your appeal |
| 03:49:05 | 23 | rights. Just keep in mind the 14-day window is strictly |
| 03:49:09 | 24 | enforced. If you intend to challenge my decision on appeal, |
| 03:49:12 | 25 | you need to do so within that time frame. |

| | | |
|---|---|---|
| 03:49:14 | 1 | **THE DEFENDANT:** Yes, ma'am. |
| 03:49:14 | 2 | **THE COURT:** Otherwise, Mr. Bell, good luck to you. |
| 03:49:16 | 3 | The Court will be in recess. |
| | 4 | *(Proceedings concluded at 3:49 p.m.)* |
| | 5 | --------------------- |

6 *I certify that the foregoing is a correct transcript from the*
7 *record of proceedings in the above-entitled matter. Any*
*redaction of personal data identifiers pursuant to the Judicial*
8 *Conference Policy on Privacy are noted within the transcript.*

9

*s/Donna L. Boland*                      *6-20-2023*
10 *Donna L. Boland, RPR, FCRR*           *Date*
*Official Court Reporter*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25